14-1042-cv
*Carol Leitner v. Westchester Community College, et al.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————————————

August Term 2014

(Argued:  September 22, 2014  Decided:  February 25, 2015)

Docket No. 14-1042-cv

—————————————

CAROL LEITNER,

*Plaintiff-Appellee,*

v.

WESTCHESTER COMMUNITY COLLEGE, JOSEPH HANKIN, in his personal and official capacity as President of Westchester Community College, CHET ROGALSKI, in his personal and official capacity as Dean and Vice President of Academic Affairs, JIANPING WANG, in her personal and official capacity as Associate Dean of the Arts and Humanities, GABRIELLE MILLER, in her personal and official capacity as Curricular Chairperson of the Communications and Media Arts Department,

*Defendants-Appellants,*

WESTCHESTER COMMUNITY COLLEGE FEDERATION OF TEACHERS LOCAL 2431,

*Defendant.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————

Before:

LEVAL, CHIN, and CARNEY, *Circuit Judges*.

————————————

Interlocutory appeal from an order of the United States District Court for the Southern District of New York (Seibel, *J.*), denying in part defendants-appellants' motion to dismiss plaintiff-appellee's first amended complaint. The district court held that defendants-appellants -- a community college and certain of its administrators -- are not "arms of the state" entitled to Eleventh Amendment sovereign immunity.

AFFIRMED.

————————————

CURTIS B. LEITNER (Catherine M. Foti, *on the brief*), Morvillo Abramowitz Grand Iason & Anello P.C., New York, New York, *for Plaintiff-Appellee.*

DENISE M. COSSU (John M. Murtagh, *on the brief*), Gaines, Novick, Ponzini, Cossu & Venditti, LLP, White Plains, New York, *for Defendants-Appellants.*

————————————

CHIN, *Circuit Judge*:

In this case, plaintiff-appellee Carol Leitner was an adjunct professor at Westchester Community College, a community college in the State University of New York ("SUNY") system. She was fired, purportedly for making offensive comments in class. She sued Westchester Community College and certain of its administrators (collectively "WCC"), claiming that they violated her state and federal constitutional rights.

The district court (Seibel, *J.*) granted in part and denied in part WCC's motion to dismiss. In relevant part, the district court concluded that WCC was not entitled to sovereign immunity under the Eleventh Amendment. We agree. Accordingly, we affirm.[1]

### STATEMENT OF THE CASE

**A.**    ***The Facts***

For purposes of this appeal, the facts alleged in Leitner's first amended complaint are assumed to be true. In addition, the organizational facts relevant to the sovereign immunity question are set forth in the governing statutes and are largely undisputed.

---

[1]    Leitner also sued her union, Westchester Community College Federation of Teachers Local 2431 (the "Union"), for breach of its duty of fair representation. The district court denied the Union's motion to dismiss, and it is not a party to this appeal.

1.    *WCC*

SUNY is a higher education system established by the New York

State Education Department, and WCC is a community college within the SUNY

system.  By statute, SUNY is comprised of four university centers, various

technical and specialized colleges, "and such additional universities, colleges and

other institutions" as are "acquired, established, operated or contracted to be

operated for the state by the state university trustees."  N.Y. Educ. Law § 352(3).

New York law defines "community colleges" as "[c]olleges established and

operated pursuant to the [New York Education Law] . . . and receiving financial

assistance from the state."  N.Y. Educ. Law § 350(2).

The laws of Westchester County provide that WCC is a "county

department."  Laws of Westchester County § 164.71.   WCC is locally sponsored

by Westchester County and is predominately operated by and accountable to

county authorities.  *See* N.Y. Educ. Law §§ 355, 6306.  WCC's Board of Trustees is

composed of ten members: four are appointed by the governor of New York, five

are appointed by the Westchester County Board, and one is appointed by WCC's

student body.  WCC's Board appoints WCC's President, adopts the curriculum,

and prepares the annual budget, all subject to approval by SUNY's Board.  N.Y.

Educ. Law § 6306(2). Judgments against WCC are paid out of its budget, one-third of which is provided by the state. *See* N.Y. Educ. Law § 6304(1).

WCC has adopted a three-step procedure for disciplining faculty members, which is memorialized in a WCC memorandum written in 1983. The memorandum states that if the administration learns of "some difficulty with the performance or decorum of a faculty member," the following disciplinary procedures are followed: (1) an informal meeting with the associate dean, department chairperson, and union representative, followed by a letter summarizing the meeting; (2) if the problem recurs, a second meeting with the parties, after which an administrator will draft a letter detailing the problem and course of remediation; and (3) if the problem persists, a hearing with the parties and WCC's dean, after which the dean may recommend termination of the faculty member. June 3, 1983 Memorandum of John F.M. Flynn.

## 2. *Leitner's Employment at WCC*

In 1981, Leitner began working as an adjunct professor at WCC, and for thirty years, she regularly taught classes in "Speech Communication" and "Voice and Diction." In 2004, Leitner had a step-one meeting to address WCC's criticism of "her refusal to lower her academic standards." App. at 504. In 2007,

Leitner had a step-two meeting to address a number of student complaints that Leitner made offensive remarks during class. After this meeting, WCC directed Leitner not to use "any language that [could] be construed as abusive, belittling, humiliating, or insulting" and to "treat every student with courtesy and respect." App. at 505.

In the fall 2010, an incident during one of Leitner's classes led to her step-three meeting, and, ultimately, WCC's termination of her employment. During a class discussion after a student's recitation of a poem, Leitner expressed her approval of Arizona's controversial immigration law and her doubts about the fairness of spending taxpayer money on public services for illegal immigrants. In June 2011, Leitner had a step-three hearing. Based on what WCC contended was a pattern of student complaints and Leitner's continued failure to comply with previous directives to follow WCC's speech code, WCC dismissed Leitner, effective July 6, 2011. Leitner contends that her termination "was the culmination of the administration's longstanding campaign of retaliation against her." App. at 519.

**B.**     *Proceedings Below*

On May 11, 2012, Leitner filed a complaint against WCC alleging that WCC improperly retaliated against her in response to her constitutionally protected in-class speech.  Leitner pled First Amendment retaliation claims and as-applied vagueness and overbreadth claims pursuant to 42 U.S.C. § 1983 and Article I, Sections 6 and 8 of the New York State Constitution.  In her amended complaint, Leitner added claims against the Union for breach of duty of fair representation and against WCC for violating her rights under the collective bargaining agreement.

WCC moved to dismiss Leitner's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) arguing, in relevant part, that the court lacked subject matter jurisdiction, the complaint failed to state a claim upon which relief could be granted, and that WCC was entitled to immunity.  Ruling from the bench on March 24, 2014, the district court, in relevant part, held that WCC was not entitled to sovereign immunity under the Eleventh Amendment. On April 4, 2014, WCC filed this interlocutory appeal challenging the district court's denial of sovereign immunity.

*DISCUSSION*

**A.     *Applicable Law***

**1.     *Jurisdiction and Standard of Review***

Our jurisdiction is generally limited to hearing "final decisions of the district courts."  28 U.S.C. § 1291.  We do, of course, have jurisdiction to hear appeals from the small class of non-final "collateral" district court orders that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).  District court orders rejecting Eleventh Amendment sovereign immunity claims fall within this small class of collateral district court orders.  Hence, we have jurisdiction to hear this appeal.  *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993); *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 235 (2d Cir. 2006).

In considering whether a governmental entity is entitled to Eleventh Amendment sovereign immunity, we review the district court's factual findings for clear error and its legal conclusions *de novo*.  *McGinty v. New York*,

251 F.3d 84, 90 (2d Cir. 2001).  All Circuits to have considered the question,

including our own, require the party asserting Eleventh Amendment immunity

to bear the burden of demonstrating entitlement.  *Woods*, 466 F.3d at 237.

> **2.** ***Eleventh Amendment Sovereign Immunity***

The Eleventh Amendment generally bars suits in federal court by

private individuals against non-consenting states.  *Port Authority Trans-Hudson*

*Corp. v. Feeney*, 495 U.S. 299, 304 (1990).  This immunity from suit encompasses

not just actions in which a state is actually named as a defendant, but also certain

actions against state agents and instrumentalities, including actions for the

recovery of money from the state.  *See Regents of the Univ. of Cal. v. Doe*, 519 U.S.

425, 429 (1997); *Hans v. Louisiana*, 134 U.S. 1, 15 (1890).  The question is whether

the state instrumentality is independent or whether it is an "arm of the state."  *See*

*Alden v. Maine*, 527 U.S. 706, 756 (1999).  Sovereign immunity does not, however,

extend to local governments or municipalities.  *See id.*

The Supreme Court has not articulated a clear standard for

determining whether a state entity is an "arm of the state" entitled to sovereign

immunity, and the Circuits have applied different tests for establishing sovereign

immunity.  The Supreme Court has emphasized, however, that "the Eleventh

Amendment's twin reasons for being" -- preserving the state's treasury and protecting the integrity of the state -- "remain our prime guide." *Hess v. PATH*, 513 U.S. 30, 47-48 (1994). The first factor, "the vulnerability of the State's purse," is "the most salient factor in Eleventh Amendment determinations." *Id.* at 48.

### 3. *The Second Circuit's Tests for Sovereign Immunity*

The Second Circuit has applied two different tests to determine whether government entities are "arms of the state" entitled to sovereign immunity under the Eleventh Amendment. The district court noted that, in this case, "it seems the outcome would be the same under either test." Spec. App. at 22.

In 1996, in *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289 (2d Cir. 1996), we applied a six-factor test to determine whether a government entity was an arm of the state: "(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state." *Id.* at 293 (citing *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391

(1979)).  If all six factors point in one direction, the analysis is complete.  *See id.*  If

the factors point in different directions, a court must focus on the two main aims

of the Eleventh Amendment, as identified by the Supreme Court: preserving the

state's treasury and protecting the integrity of the state.  *See id.*; *Hess*, 513 U.S. at

47.

In *Mancuso*, we found the factors relating to the New York State

Thruway Authority to point in different directions, and ultimately held that it

was not entitled to sovereign immunity because, while closely identified with the

state, it was generally self-funded and not under significant state control.   86

F.3d at 296.  We have applied this test in cases involving school boards and local

school districts, concluding that such entities were not arms of the state entitled

to sovereign immunity.  *See, e.g.*, *Gorton v. Gettel*, 554 F.3d 60, 62-64 (2d Cir. 2009)

(per curiam) (holding that board of cooperative education services was not

entitled to sovereign immunity); *Woods*, 466 F.3d at 243-51 (holding that board of

education was not entitled to sovereign immunity); *Fay v. S. Colonie Cent. Sch.

Dist.*, 802 F.2d 21, 27-28 (2d Cir. 1986), *overruled on other grounds by Taylor v. Vt.

Dep't of Educ.*, 313 F.3d 768, 786 (2d Cir. 2002) (holding that school district was

not entitled to sovereign immunity); *cf. McGinty*, 251 F.3d at 95-100 (holding that

New York State and Local Employees' Retirement System was entitled to
sovereign immunity).

In 2004, in *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir.
2004) (per curiam), we applied a two-factor test to "guide the determination of
whether an institution is an arm of the state: (1) the extent to which the state
would be responsible for satisfying any judgment that might be entered against
the defendant entity, and (2) the degree of supervision exercised by the state over
the defendant entity." *Id.* (quoting *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 600
(2d Cir. 1999) (per curiam)) (internal quotation marks omitted).

In *Clissuras*, we held that the New York City College of Technology,
a senior college that by statute was part of the City University of New York
("CUNY"), was an arm of the state entitled to sovereign immunity because: (1)
the comptroller of the state is responsible for money judgments against a senior
CUNY college; and (2) ultimate control over how CUNY is governed and
operated rests with the state. 359 F.3d at 81-82. We did not cite *Mancuso* or
discuss the six-factor test, and while we have not applied the two-part test in a
subsequent precedential opinion, we have continued to cite it in summary
orders. *See, e.g., Shibeshi v. City Univ. of N.Y.*, 531 F. App'x 135, 135 (2d Cir. 2013)

(summary order) (affirming finding that CUNY was entitled to sovereign immunity, citing *Clissuras*); *Gengo v. City Univ. of N.Y.*, 479 F. App'x 382, 383 (2d Cir. 2012) (summary order) (same); *Skalafuris v. City of New York*, 444 F. App'x 466, 468 (2d Cir. 2011) (summary order) (citing *Clissuras* to support proposition that CUNY's senior colleges are entitled to sovereign immunity); *Sank v. City Univ. of N.Y.*, 112 F. App'x 761, 763 (2d Cir. 2004) (summary order) (affirming finding that CUNY and City College of New York were entitled to sovereign immunity, citing *Clissuras*).

At the same time, we have continued to apply the *Mancuso* six-part test. *See, e.g.*, *Gorton*, 554 F.3d at 62; *Walker v. City of Waterbury*, 253 F. App'x 58, 60-61 (2d Cir. 2007) (summary order). District courts have continued to apply both tests. *See, e.g.*, *Gengo v. City Univ. of N.Y.*, No. 07-CV-681, 2011 WL 1204716, at *3 (E.D.N.Y. Mar. 29, 2011), *aff'd*, 479 F. App'x 382 (applying the *Clissuras* two-part test); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 514 F. Supp. 2d 328, 337 (D. Conn. 2007) (applying the *Mancuso* six-part test). Hence, there is a lack of clarity as to whether the *Mancuso* six-part or the *Clissuras* two-part test governs, or whether both can serve simultaneously as useful guides.

4.      *Sovereign Immunity for SUNY Community Colleges*

While we have held that SUNY itself is entitled to sovereign

immunity because it is "an integral part of the government of the State," *Dube v.*

*State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990) (internal quotation marks

omitted), we have yet to decide whether sovereign immunity extends to SUNY's

community colleges.  Although the district courts in this Circuit have, on several

occasions, found that different SUNY community colleges are entitled to

sovereign immunity, the cases provide little guidance as to the appropriate

analysis.  Several district courts have simply cited our finding from *Dube* that

SUNY is entitled to sovereign immunity before similarly finding that a SUNY

community college enjoys sovereign immunity.  *See, e.g.*, *Davis v. Stratton*, 575 F.

Supp. 2d 410, 424 (N.D.N.Y. 2008), *rev'd on other grounds*, 360 F. App'x 182 (2d

Cir. 2010); *Staskowski v. Cnty. of Nassau*, 05-CIV-5984, 2006 WL 3370699, at *1

(E.D.N.Y. Nov. 16, 2006); *Fabio v. Nassau Cmty. Coll.*, 02-CV 6237 (E.D.N.Y. Feb.

26, 2004).  One district court explicitly applied the two-part *Clissuras* test to hold

that SUNY Rockland Community College was entitled to sovereign immunity.

*Kohlhausen v. SUNY Rockland Cmty. Coll.*, No. 10-CIV-3168, 2011 WL 1404934, at

*8 (S.D.N.Y. Feb. 9, 2011).

Other Circuits examining the question whether a particular state's community colleges are entitled to sovereign immunity have conducted detailed inquiries into those colleges' fiscal and governance structures. As in our own *Mancuso* and *Clissuras* tests, such inquiries have focused on how much funding a community college receives from its state government, whether a money judgment against the community college will be borne by the state treasury, the balance between local and state control over the community college, and relevant distinctions that state law draws between community colleges and other governmental entities traditionally entitled to immunity. Given the state-specific nature of these questions, federal courts have unsurprisingly concluded that community colleges in some states are entitled to Eleventh Amendment immunity, while community colleges in other states are not.[2] In general, where a

---

[2] *See, e.g.*, *Williams v. Dist. Bd. of Trustees of Edison Cmty. Coll.*, 421 F.3d 1190, 1192-94 (11th Cir. 2005) (finding Eleventh Amendment immunity where all members of Florida community college's board of trustees were appointed by governor, and where state was liable for money judgments against community college); *Hadley v. N. Ark. Cmty. Technical Coll.*, 76 F.3d 1437, 1439-42 (8th Cir. 1996) (finding Eleventh Amendment immunity where Arkansas state legislature identified community college as "state agency" and where state appropriations accounted for 75.1% of college's operating expenses); *Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) (finding Eleventh Amendment immunity where state law identified California community colleges as "dependent instrumentalities of the state," where colleges' funding came exclusively from state appropriations and tuition fees set by state, and where some of those tuition fees were re-appropriated by state (internal quotation marks omitted)); *Hander v. San Jacinto Junior Coll.*, 519 F.2d 273, 278-79 (5th Cir. 1975) (finding no Eleventh Amendment immunity where Texas junior college's board of trustees was locally elected and had the power "to issue revenue bonds and to levy . . . taxes," and where state appropriations only supplemented local funding); *see also Griner v. Se. Cmty. Coll.*, 95 F. Supp. 2d 1054, 1059-60 (D. Neb. 2000) (finding no Eleventh Amendment immunity where Nebraska community college's general operating funds did "not come primarily from

- 15 -

community college is predominantly or exclusively dependent on state appropriations rather than local funding, or where the state government controls the college's board of trustees, courts have found the college to be an "arm of the state" and thus entitled to Eleventh Amendment immunity. Absent these conditions, courts have generally declined to extend immunity to community colleges.

**B.** *Application*

We apply both the *Mancuso* and *Clissuras* tests. In the end, as we have seen in our review of the cases, the tests have much in common, and the choice of test is rarely outcome-determinative. The *Clissuras* test incorporates four of the six *Mancuso* factors. To the extent that the *Clissuras* factors point in different directions, the additional factors from the *Mancuso* test can be instructive. Here, we address the *Clissuras* factors first and then look to the additional *Mancuso* factors.

---

the state treasury," and where there was "neither evidentiary nor statutory evidence that the state of Nebraska would necessarily be liable for payment of a judgment rendered against" college (internal quotation marks omitted)) (distinguishing Nebraska law from Arkansas law analyzed by Eighth Circuit in *Hadley*); *Gardetto v. Mason*, 854 F. Supp. 1520, 1543-44 (D. Wy. 1994) (finding no Eleventh Amendment immunity where Wyoming state legislature had defined "community college districts" as form of "local government," where college's trustees were elected by local voters, and where the college's board had independent power to raise revenue (internal quotation marks omitted)).

1. *State's Responsibility for WCC's Financial Obligations*

The first *Clissuras* factor, and the most important factor in determining whether a state entity is entitled to sovereign immunity, is "whether a judgment against the entity must be satisfied out of a State's treasury." *Hess*, 513 U.S. at 31. This condition is also reflected in the third and sixth *Mancuso* factors, which address how the entity is funded and whether the entity's obligations are binding upon the state, respectively. These considerations weigh against a finding that WCC is entitled to sovereign immunity. WCC receives one-third of its budget from New York State, but the state is not otherwise responsible for WCC's debts or for satisfying judgments against WCC. Rather, Westchester County, which appoints half of WCC's Board of Trustees, has the power to issue bonds and levy taxes to raise funds for WCC. *See* N.Y. Educ. Law § 6304(1)(c). Additionally, if WCC exceeds its budget, the excess is borne by local, not state, sponsors. *See* N.Y. Educ. Law § 6304(1)(c)(3).

Receipt of government funding is relevant in determining whether the state is responsible for judgments against a state entity like a community college. The district court in *Kohlhausen* reasoned that "[t]he absence of an express payment authorization provision suggests that judgments rendered

against the SUNY community college or its employees or trustees in their official

capacities are simply paid out of the community college's operating budget, to

which the state contributes one-third." 2011 WL 1404934, at *7. Thus, the district

court held, "there is some indication that responsibility for money judgments

against [the college] rests with the state." *Id.* While WCC -- like the SUNY

community college in *Kohlhausen* -- also obtains one-third of its budget from the

state, this fact alone is not sufficient to establish state responsibility for a

community college's financial obligations.

We have repeatedly held that a school board's receipt of funds from

state appropriations is not equivalent to satisfaction of a judgment against the

board from the state treasury. *See Woods*, 466 F.3d at 249; *Rosa R. v. Connelly*, 889

F.2d 435, 437-38 (2d Cir. 1989); *Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 27 (2d

Cir. 1986), *overruled on other grounds by Taylor v. Vermont Dep't of Educ.*, 313 F.3d

768 (2d Cir. 2002). Indeed, we did not extend sovereign immunity to the school

board in *Woods*, which received 39.9% of its funding from the state. 466 F.3d at

245. New York Education Law § 1709(26) clearly provides that where local funds

are insufficient to satisfy a judgment against a local board of education,

additional funds are obtained not from the state treasury but from levying a local

property tax.  *See Woods*, 466 F.3d at 250.  While the Education Law provisions

governing community colleges are not as explicit, they similarly require local

sponsors to levy taxes if a college's budget exceeds the maximum costs allowed

by the state.  N.Y. Educ. Law § 6304(3) (stating that college is not prohibited from

exceeding state's budget so long as "the excess costs over such prescribed limits

or allowances shall be borne and paid for or otherwise made available to or by

such [local] sponsors"); N.Y. Educ. Law § 6304(5-a) (stating that community

college shall "provide for the raising of taxes required by such budget").

We thus conclude that the first *Clissuras* factor -- the state's

responsibility for satisfying judgments against WCC -- weighs against a finding

that WCC is entitled to sovereign immunity.

### 2.  *State Control Over WCC*

The second *Clissuras* factor, the extent of the state's control over a

community college, also weighs against a finding that WCC is entitled to

sovereign immunity.  This condition is also reflected in the second and fifth

*Mancuso* factors, which consider how the governing members of the entity are

appointed and whether the state has veto power over the entity's actions,

respectively.  WCC has not demonstrated that these considerations favor a finding that WCC is entitled to sovereign immunity.

WCC is not substantially controlled by the state.  The governor appoints four of WCC's ten board members, while the Westchester County Board appoints five members and WCC's student body elects one member.  This balance between state and local appointment differs from that at issue in *Clissuras*, where ten of CUNY's seventeen board members were appointed by the state.  359 F.3d at 82.  While it is certainly conceivable that the state's control of four votes could yield control of WCC's board, WCC has not met its burden of demonstrating such effective control over board decision-making.

Further, as the district court here emphasized, there is no indication in the record that the state has control over WCC's day-to-day operations.  While WCC's officers, curriculum, and budget are subject to board approval and SUNY provides the standards and regulations governing WCC's organization and operation, such powers are not dispositive for sovereign immunity.  *See* N.Y. Educ. Law § 6306; N.Y. Comp. Codes R. & Regs. tit. 8, §§ 600.1, 600.2.  We have held that state approval, or state veto power, over a state entity is not dispositive for the purpose of sovereign immunity.  *See Gorton*, 554 F.3d at 63 (holding that,

while applying *Mancuso* test, board of cooperative educational services was not

entitled to sovereign immunity in spite of state's "substantial veto power" over

board's decisions); *Woods*, 466 F.3d at 248 (concluding that Commissioner of

Education's broad power to remove school officers, withhold funds, and review

actions by school board "does not unequivocally equate to veto authority").

Similarly, the state's oversight of WCC here does not equate to state control and

thus does not weigh in favor of sovereign immunity. *See Connelly*, 889 F.2d at

437 (stating that state stewardship of education does not transform entity into

"alter ego of the state" (quoting *Fay*, 802 F.2d at 27)).

We thus conclude that the second *Clissuras* factor -- the degree of the

state's control over the entity -- weighs against a finding that WCC is entitled to

sovereign immunity. WCC is not an arm of the state entitled to sovereign

immunity under the *Clissuras* test.

**3.** ***Additional* Mancuso *Factors***

The additional *Mancuso* factors support the conclusion that WCC is

not entitled to sovereign immunity.

The first *Mancuso* factor -- how the entity is referred to in the

documents that created it -- weighs against a finding that WCC is entitled to

sovereign immunity. While SUNY's website designates WCC as part of SUNY, the New York Education Law creates community colleges separately from its creation of SUNY. *See* N.Y. Educ. Law §§ 350, 352. In a case involving the Fashion Institute of Technology ("FIT"), which is statutorily categorized as a SUNY community college, we affirmed the district court's holding that FIT is properly categorized as a community college, statutorily distinct from SUNY. *Mostaghim v. Fashion Inst. of Tech.*, 01-CIV-8090, 2001 WL 1537544, at *2-3 (S.D.N.Y. Dec. 3, 2001), *aff'd sub nom. Mostaghim v. Fashion Inst. of Tech. Student Ass'n*, 57 F. App'x 497 (2d Cir. 2003) (summary order). Here, WCC is also a community college created separately from SUNY by the governing statutory framework.

The fourth *Mancuso* factor -- whether the entity's function is state or local -- similarly weighs against a finding of sovereign immunity. The New York Court of Appeals has held that operation of SUNY community colleges serves a municipal function. *See Grimm v. Rensselaer Cnty.*, 4 N.Y.2d 416, 421 (1958). The New York legislature has also acknowledged the local function of higher education by vesting control of community colleges in boards of trustees that are accountable to local governments rather than the state. *See* N.Y. Educ. Law

§ 6302.  Additionally, the New York Court of Claims, which has exclusive jurisdiction over suits against the state, does not have jurisdiction over SUNY community colleges, as such claims "cannot be characterized as being against the State of New York."  *Amato v. State*, 502 N.Y.S.2d 928, 929 (Ct. Cl. 1986).  All of these considerations confirm that WCC is not a state entity.

* * * * *

We conclude that a finding of sovereign immunity for WCC would not serve the twin aims of the Eleventh Amendment: immunity would not further the state's interest in preserving its treasury, nor would it protect the integrity of the state.  Accordingly, we hold that WCC is not an arm of the state entitled to sovereign immunity under the Eleventh Amendment.

### CONCLUSION

Accordingly, the decision of the district court is AFFIRMED.